# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **NORBERTO VALLES, and** | § | |
| **UNDREA BAILEY, INDIVIDUALLY** | § | |
| **AND AS NEXT FRIEND OF J.B. (MINOR)** | § | |
| **AND LILLIAN BAILEY** | § | **REMOVED FROM THE 129TH JUDICIAL** |
| | § | **DISTRICT COURT, HARRIS COUNTY,** |
| *Plaintiff/Intervenor Plaintiffs*, | § | **TEXAS, CAUSE NO.: 2017-72382, AND** |
| | § | |
| **v.** | § | **CIVIL CASE NO. 4:19-cv-1725** |
| | § | |
| **THE CORDISH COMPANY;** | § | |
| **CENTERPOINT ENERGY HOUSTON** | § | |
| **ELECTRIC, LLC;** | § | |
| **PIPER DEVELOPMENT, LLC;** | § | |
| **LIGHTNING COMMERCIAL, LLC;** | § | |
| **BAYOU PLACE LIMITED PARTNERSHIP;** | § | |
| **HOUSTON FIRST CORPORATION;** | § | |
| **GILBANE RECONSTRUCTION** | § | |
| **SERVICES, LLC; GILBANE** | § | |
| **DEVELOPMENT COMPANY; GILBANE** | § | |
| **BUILDING COMPANY; DND** | § | |
| **CONSTRUCTION SERVICES, LLC;** | § | |
| **FACILITY SOLUTIONS** | § | |
| **GROUP, INC.; DRAKE ELECTRIC** | § | |
| **SERVICES, LLC; and** | § | |
| **DRAYCATAN ENTERPRISES, INC.** | § | |
| | § | |
| *Defendants.* | § | |

## THE CORDISH COMPANY'S NOTICE OF REMOVAL

The Cordish Company ("Cordish") hereby files this Notice of Removal of the above titled and numbered cause.

1

## I.     THE NATURE OF THE CASE

### A.     NATIONAL EMERGENCY— "A THREAT OF IMMINENT DISASTER"

"Hurricane Harvey was the most significant tropical cyclone rainfall event in United States history, both in scope and peak rainfall amounts, since reliable rainfall records began around the 1880s." **Ex. A**, pg. 6 (NOAA Hurricane Center Tropical Cyclone Report, Hurricane Harvey).[1] "These rains caused catastrophic flooding in Harris County (which includes the city of Houston) recording all-time high flood stages." **Ex. A**, pg. 6.  Damage to property across Houston was widespread due to "catastrophic flooding, and Harvey is the second-most costly hurricane in U.S. history[.]" **Ex. A**, pg. 1.  On August 23, 2017, as Hurricane Harvey loomed in the Gulf of Mexico, the Governor of Texas formally asked the federal government for aid, through a Proclamation of a State of Disaster— "Harvey poses a threat of imminent disaster, including severe flooding[.]" **Ex. B** (State Proclamation).[2]  On August 24, 2017, the Mayor of Houston issued a Proclamation Declaring a Local State of Disaster.  **Ex. C** (Houston Emergency Operations Center Alert).[3]  On August 25, 2017, Harris County issued a Declaration of Disaster.  **Ex. D.**  In response to the state and local proclamations, on August 25, 2017, the President of the United States declared a state of emergency, and issued a Declaration of Major Disaster pursuant to the federal Stafford Disaster Relief and Emergency Assistance Act.  **Ex. E** (Federal Declaration).[4]  The federal Declaration authorized federal funding of emergency response, hazard mitigation, and recovery efforts;

---

1.      *Available at,*  https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf  (last visited May 2, 2019). Government websites are self-authenticating.  *Rychorcewicz v. Welltec, Inc.*, No. H-16-2, 2018 U.S. Dist. LEXIS 123512, at *16 (S.D. Tex. 2018).

2       *Available at,*  https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/emergency/82486/disaster-storm-harvey-proc-08-23-17.pdf (last visited May 3, 2019).

3.      *Available at,*  https://www.houstonemergency.org/mayors-proclamation-state-of-disaster-for-houston/  (last visited May 2, 2019).

4.      *Available at*, https://www.fema.gov/disaster/notices/initial-notice-7 (last visited May 7, 2019).

authorized direct assistance from the federal government; and directed FEMA to provide "any other forms of assistance under the Stafford Act that FEMA deem[ed] appropriate[.]" *Id.*

**B.    AFTER THE RAIN:  "APRES MOI, LE DELUGE"—"AFTER ME, THE FLOOD"**

At midnight, Harvey roared ashore as a Category 4 hurricane.  **Ex. A**, pg. 3.  Harvey then stalled, with some of its heaviest rains directly over "[t]he Houston Metro . . . torrential rains fell in these locations near a stationary front[.]"  **Ex. A**, pg. 3.  On August 27, 2017, the National Weather Service issued an alert, stating "[t]his event is unprecedented and all impacts are unknown and beyond anything experienced.  Follow orders from officials[.]"  **Ex. F** (NWS Alert).[5]  "The most extreme cases [of flooding occurred in Houston: the high values reported by these gauges were largely caused by excessive rainfall[.]"  **Ex. A**, pg. 6.  "The exceptional rainfall [caused] [w]idespread flooding of homes and businesses . . . [r]ecord water levels were observed on Buffalo Bayou [and a multitude of other areas]."  **Ex. A**, pg. 9.

**C.    "HURRICANE HARVEY HAS CAUSED WIDESPREAD POWER OUTAGES"—THE FEDERAL GOVERNMENT COORDINATES RESPONSE EFFORTS, AND THE GOVERNOR OF TEXAS "SUSPENDS ALL LAWS" HINDERING RESTORATION OF THE ELECTRIC UTILITY GRID**

Widespread flooding was occurring throughout Houston, and the number of power outages dramatically increased as the disaster unfolded— electrical equipment was being submerged in the flood.

The United States Department of Energy ("DOE") was "closely monitoring energy infrastructure impacts and coordinating across the federal community, state and local governments,

---

5.    FEMA later testified to Congress that the federal government's use of social media platforms for communications with the public during Harvey was innovative, and a groundbreaking development for disaster response planning.  "During the initial response phase, people used social media to provide the locations of people needing rescue, to report on conditions, and to facilitate the coordination of volunteer activities and resources. During the recovery phase, FEMA employed tools such as the FEMA mobile application and Facebook Live to provide real-time updates and disseminate important information."  **Ex. G.**, pg. 10.  Congressional Testimony before Committee on Homeland Security.

and with industry partners." **Ex. H** (DOE Report, August 25, 2017).  DOE issued updates twice daily.  **Ex. I**.  DOE dispatched emergency responders to FEMA, and both regional and state emergency response coordination and operation centers in Texas.  **Ex. H.**  DOE took the lead in coordinating response efforts with "all of the different sectors of the electric industry[.]"  **Ex. J**, pg. 131 (Transcript of Oct. 3, 2017 Congressional Hearing).  On August 28, 2017, at 4:00 p.m., DOE issued an Event Report stating that 292,704 electricity users' electricity had been knocked out, and warned that "[r]estoration in severely damaged or flooded areas will be delayed[.]"  **Exhibit K**, pg. 4 (U.S. DOE Event Report #6, August 28, 2017).  DOE, coordinating with Centerpoint at a granular level, reported that floodwaters were blocking Centerpoint from addressing customers in Downtown Houston.  *Id.*  The Governor of Texas reported State executive actions to DOE, and DOE reported them to all concerned parties.  *See, e.g,* **Ex. K**, pg. 4 (summarizing recent actions taken by the Governor of Texas).

The Governor of Texas made a critical decision, and issued an expanded State Disaster Proclamation within hours of the 4:00 p.m. DOE Update.  "Pursuant to his powers as Governor of the State of Texas, Greg Abbot has issued [a] proclamation that suspends all laws allowing public utilities to enter and use private property as necessary for the limited purpose of connecting power lines and reconstructing the electric utility grid[.]"  **Ex. L**, pg. 1 (August 28, 2017 Proclamation). He directed all "State and local political subdivisions and special districts to temporarily provide full and complete access to . . . utility and other public easements and state-owned or controlled land for these same purposes[.]"  *Id.*, pg. 2.  He did so pursuant to his power to "commandeer or use any private property" in an emergency, under a statute that specifically contemplates coordination with the federal government engaged in response efforts pursuant to the federal Stafford Act.  Tex. Gov. Code 418.016(g)(1); 418.017.  DOE advised all interested agencies of the

4

Proclamation in furtherance of its coordination and response efforts. **Ex. M**, pg. 4 (DOE Event Report #8, August 29, 2017). Later, DOE advised all interested agencies that Centerpoint had begun staging crews in multiple areas around Houston. **Ex. N**, pg. 1 (DOE Event Report #9, August 30, 2017).

### D. "GET OUT NOW"— THE ARMY CORPS OF ENGINEERS INTENTIONALLY FLOODS AREAS OF HOUSTON: "A DIFFICULT, BUT NECESSARY DECISION"

On August 28th, the Army Corps of Engineers grew concerned that rising water levels would result in uncontrolled releases of floodwaters from the federally-controlled Addicks and Barker Reservoirs. **Ex. O** (Army Corps News Release, August 28, 2017).[6] They were also concerned the dams for the reservoirs would catastrophically fail. **Ex. A**, pg. 9. To combat rising water levels, the U.S. Army Corps of Engineers began controlled releases into Buffalo Bayou from both the Addicks and Barker Reservoirs. **Ex. O.** This "[caused] further flood[ing]." **Ex. A**, pg. 9. If the Army Corps of Engineers had not released the floodwaters, would the Addicks and Barker Dams have held? Perhaps; —but perhaps not. A few hours later on August 29, and just a few miles away, at 7:31 a.m., Brazoria County issued an emergency alert for a levee (**Ex. P**, (Brazoria Alert)):[7]



Within hours of the levee breach, the Army Corps of Engineers had to make a "difficult, but necessary" decision, and "made increased controlled releases . . . to maintain control of the Addicks and Barker Dams." (**Ex. Q**, Army Corps News Release, August 29, 2017).[8]  The Army Corps of Engineers knew the decision would cause even more widespread flooding, and conceded: it "was a difficult, but necessary one that we did not take lightly." **Ex. Q**.

### E.  BAYOU PLACE

Bayou Place is a large entertainment complex located in the Houston Downtown Management District (**Ex. R**)[9] in western Downtown Houston, and services the Houston Theater District and fine arts community in Houston. **Ex. S** (Houston Downtown Description).[10] Bayou Place, however, also services critical governmental infrastructure in the Houston Downtown District. "[O]perations of a district are considered to be essential government functions[.]" Tex. Local Gov. Code § 375.004. A gigantic parking garage sits underneath Bayou Place (**Ex. T**).



---

8.    *Available at*, https://www.swg.usace.army.mil/Media/News-Releases/Article/1294566/usace-makes-unexpected-releases-from-addicks-and-barker-dams/ (last accessed May 2, 2019).

9.    *Available at*, http://www.downtowndistrict.org/about-us/governance/ (discussing creation under Tex. Local Gov. Code, Chapt 375, and Tex. Special Downtown Districts Code, Chapt. 3801)(last accessed May 7, 2019).

10.    *Available at*: https://www.downtownhouston.org/guidedetail/sights-attractions/bayou-place/ (website of Houston Downtown Management District)(last accessed May 7, 2019).

The Bayou Place garage services the Bob Casey Federal Courthouse and City Hall.[11]   (**Ex. U**, Houston First Corp. Map).  It also services the Hobby Center, Wortham Center, Jones Hall, and Alley Theater.  (**Ex. U**).  Defendant Houston First Corporation, "a local government corporation," operates the underground parking garage, Jones Hall, and Wortham Center.  (**Ex. V**, Houston First Corporation Website).[12]  Houston First receives special Enterprise Funds from the City of Houston for Bayou Place and Bayou Place garage operations.  **Ex. W**, pg. 147 (Houston Financial Report).[13] Houston First Corporation describes itself as a partner of the Hobby Center and Bayou Place.  *Id.* Thus, the Bayou Place garages are run by a government entity, and the Bayou Place garages service, and are surrounded by both federal and city government buildings.  "[In] Hurricane Harvey, a majority of the flood-damaged properties in Downtown were public facilities including the Municipal Courts Building, HPD's 61 Riesner, 62 Riesner, City Hall and City Hall Annex, Bayou Place, Wortham Theater and the Theater District/ Civic Center Garages.  As the governmental seat for the City of Houston, the facilities and operational infrastructure in western Downtown across the approximately 100 acres of City-owned property are of paramount significance for the continued economic and administrative vitality of Houston."  **Ex. X,** pg. 4 (Houston Development Plan).   "Theater District Parking is a vital, hidden asset that serves Houston's central business district around the clock."  **Ex. Y**, pg. 21 (Houston First Powerpoint).

Defendant Bayou Place L.P. operates the above-ground entertainment venues as the City of Houston's tenant.  **Ex. Z**, (Lease, Bayou Place 00001; 00138, sec. 17.10).  The Houston-Bayou Place Lease was originally entered into between the City of Houston and the predecessor-in-

---

11.      *Available at*:  https://www.houstonfirst.com/information/about-us/ (last accessed May 6, 2019)(Follow "About us" link under Information tab, Follow "Theater District Parking" hyperlink in body of site, Follow "Click here" hyperlink for map listing buildings serviced).
12.      *Available at*:  https://www.houstonfirst.com/information/about-us/ (last accessed May 6, 2019).
13.      *Available at:*  https://www.houstontx.gov/controller/cafr/cafr2006.pdf (last accessed May 7, 2019).

interest of Bayou Place L.P. ("TALP"), and executed by TALP's general partner, Defendant The Cordish Company.  **Ex. Z,** pg. 000144.  The Lease contemplated Bayou Place would be still operated by an affiliate of the Cordish Company, even if later assigned to a different entity.  **Ex. Z**, pg. 000145 (defining, "Acceptable Operator").  Bayou Place L.P. is a subsidiary of The Cordish Company.  Texas Attorney General Opinion 2011-06064, 2011 Tex. AG. Ltr. Rul. LEXIS 5988.  In 2001, TALP assigned the Lease to Defendant Bayou Place, L.P., and in 2008, the Lease was renewed through a Fourth Amendment Lease with Defendant Bayou Place L.P. as the contracting party.  **Ex. Z,** pg. 000497.  Pursuant to the Lease, the City of Houston granted favorable tax treatment, because Bayou Place is located in, and services a special governmental entertainment district and "Reinvestment Zone" and government facilities that are of "paramount" importance "to the City."  **Ex. Z**, pg. 000227-228; *see also*, **Ex. X,** pg. 4 (Houston Development Plan); Tex. Special Downtown Dist. Code § 3801.006 (authorizing downtown districts to create reinvestment zones).  "The parties represent that the project will constitute a regional entertainment facility, as defined in Section 44-109 of the Code[.]" **Ex. Z**, pg. 00231.  "The City [of Houston] has an interest in a share of the total revenues generated under the lease of the facility," and governmental privileges inure to Cordish and Bayou Place by virtue of their relationship with the City of Houston.  Texas Attorney General Opinion 2011-06064, 2011 Tex. AG. Ltr. Rul. LEXIS 5988 (applying statutory governmental exemption from requests for records of correspondence between the City of Houston, Cordish, and Bayou Place L.P., due to government interest).

### F.    BAYOU PLACE IS FLOODED

When the Army Corps of Engineers was forced to make increased discharges on August 29, 2017, they reported that 13,000 cubic feet of water <u>per second</u> were being released by the Addicks and Barker Dams.  **Ex. Q**.  That is an almost incomprehensible amount of water.  Put in

perspective, that means the Army Corps of Engineers released enough water to flood 19,500 professional football fields in a cubic foot of water within a day after releasing floodwaters at that rate.[14]  Bayou Place, which sits on the banks of Buffalo Bayou, was a few miles downstream from the water rocketing out of the floodgates at the Addicks and Barker Dams.



The Army Corps of Engineers knew that the Bayou Place garages would be flooded when the Army Corps of Engineers released the Addicks and Barker Dam floodgates. (**Exhibit AA,** Inundation Map).[15]  On August 29, 2017, the Army Corps of Engineers released an inundation map depicting areas flooded "due to the increased releases" on August 29 by the Army Corps of Engineers.  *Id.*  The area bounded by red is the same garage complex depicted *supra*. The blue shading indicates the Bayou Place garages were flooded as a result of the Army Corps of Engineers' actions.  "More than 270 million gallons of water filled all three levels of the Theater District underground parking garages . . . [t]his includes the green, yellow and blue garages." (**Exhibit BB,** Houston First Press Release).[16]  Electrical equipment located in the Bayou Place garages was inundated and damaged by the floodwaters the Army Corps of Engineers released.  *Id.*

---

14.    A professional football field is 160 feet wide, and 360 feet long.  NFL Rules, Section 1, Article 1, *Available at*, https://operations.nfl.com/the-rules/2018-nfl-rulebook/ (last visited May 6, 2019).  The area of a football field is therefore 57,600 ft$^2$.  A cubic foot being a foot long on each side, determining how many football seconds it would take to flood a football field is as follows:  4.4307 seconds = 57,600 ft$^2$ ÷ 13,000 ft$^2$ (seconds).  There are 86,400 seconds in a day.  That means within a day of releasing 13,000 cubic feet of water per second, the Army Corps of Engineers had released enough water to flood the equivalent of the following number of football fields under a cubic foot of water:  19,500.3047 = 86,400 seconds ÷ 4.4307 seconds (football fields).

15.    *Available at*:  https://www.swg.usace.army.mil/Media/News-Stories/Article/1294384/addicks-and-barker-potential-flood-maps/ (last accessed May 6, 2019).

16.    *Available at*:  https://www.houstonfirst.com/news/harvey-recovery/theater-district-underground-parking-garages/ (last accessed May 6, 2019).

### G.   FEDERAL FUNDING FOR REMEDIATION WORK AT BAYOU PLACE

As soon as possible after Hurricane Harvey had passed, the federal government, in coordination with state and local authorities, began remediation and hazard mitigation work in Houston.  Congress appropriated $7.4 billion for a FEMA Disaster Relief Fund on September 8, 2017.  (Exhibit **CC**, pg. 3; 11 (2017 Disaster Supplemental Appropriations: Overview).[17]  After a disaster, FEMA funds are distributed to the affected State, and then allocated to local governments. **Ex. DD,** pg. 20 (Hurricane Harvey Recovery: A Progress Report).[18]  "[I]n the immediate aftermath of [Harvey]" FEMA funds to "cover emergency protective measures to protect health and safety and City facilities" were disbursed.  *Id.* at 21.  This specifically included "$66 Million of Emergency repair and stabilization costs to the Theater District."  *Id.*  A portion of those funds were specifically designated for repairs to the "Wortham Theater and Garages" as a "Priority Repair/Construction Project[.]"  *Id.* at 22-23.  Federal government funding will pay for 90-100% of those repairs.  "[D]ue to the size and scope of Harvey, FEMA will fully reimburse the City [of Houston] for out-of-pocket expenses at 100 percent for the first 30 days after the event and at 90 percent after that time[.]"  *Id.* at 21.  There is a catch, however— there are strict requirements detailing exactly how funding is spent, and the work is done.  "Strict and detailed rules for administering this assistance must be followed to the letter to avoid possible future deobligation – or 'claw-back' – of the funds from the City. FEMA tracks each type of damage into categories of work that range from emergency to 'put back' activities to reconstruction."  *Id.* at 20.

---

17.    *Available at*, https://fas.org/sgp/crs/homesec/R45084.pdf (last accessed May 6, 2019).
18.    *Available at*, https://www.houstontx.gov/postharvey/public/documents/11.28.2018_odum_report.pdf (last visited May 6, 2019).

### H.     FEDERALLY-FUNDED FEMA REMEDIATION WORK AT BAYOU PLACE

At the city level, Defendant Houston First Corporation was responsible for coordinating the work on the Bayou Place garage after Harvey (Exhibit **BB**, Houston First Press Release). Houston First contracted with Defendant Gilbane Reconstruction Services, LLC on August 29, 2017, the same day the Army Corps of Engineers increased Addicks and Barker Dam outflows and flooded the Bayou Place garages.  **Ex. EE** (Houston-Gilbane Contract).

The contract was to "secure the Services in connection with real property damages or losses arising from Hurricane Harvey with respect to certain facilities owned by the City of Houston and managed or leased by Owner . . . [t]he Services provided under this [contract] are intended to return the real property to its pre-loss condition[.]"  *Id.* at sec. 1.1.  The scope of work included "services required to stabilize the conditions of the existing 18 block Theater District Parking Garages, the Wortham Theater Center Jones Hall and other facilities identified by Owner (including supporting areas and connections to/from the buildings as part of the existing tunnels within these venues)."  *Id.* at Ex. A.  DND Construction Services, LLC sub-contracted with Gilbane Reconstruction Services, LLC to act as Gilbane's "Program Manager Representative." **Ex. FF** (DND-Gilbane Contract).  Gilbane complied with FEMA's "strict and detailed rules" discussed *supra*, so that the City of Houston could seek reimbursement from FEMA.  **Ex. GG**, Walsh Depo., pg. 217:13-21.  "There was FEMA inspections that came through to document the damages, and we spent a couple of weeks with them."  *Id.* at pg. 218:2-4.  DND and Gilbane were aware that FEMA would "potentially" need to inspect their work, because remediation work "is supposed to be inspected by FEMA."  *Id.* at 218:10-16.

Gilbane agreed to provide "the engagement, management, leadership and coordination of architects, engineers, surveyors, testing laboratories, construction manager, subcontractors,

vendors and specialty consultants necessary to execute the Services." **Ex. EE**, sec. 3.2.  In addition, Gilbane agreed it would coordinate with third parties engaged by the City directly. **Ex. EE**, sec. 3.2.  Gilbane also agreed to identify "any additional actions required by the Owner to facilitate[.]" **Ex. EE**, sec. 5.1(f).  The contract required Gilbane to "[e]stablish on-site organization and lines of authority[.]" *Id.* at 5.3(a)(3).  Houston First was obligated to have any third-parties working under Houston First directly to cooperate reasonably with Gilbane.  *Id.* at 7.13.

I.     **THE PLAINTIFFS ARE ELECTROCUTED ON FLOOD-DAMAGED EQUIPMENT: "I THOUGHT IT WAS ISOLATED"**

On August 28, 2017, a Senior Regional Consultant for Gilbane's Program Manager Representative DND flew to Texas to begin work even before the Gilbane contract with Houston First was formally executed. **Ex. GG**, Walsh Depo. 7:21-25; 44:19-25; 45:1-6.  Engineers working for Gilbane flew down "within the first week." *Id.* at 45:4-6.  As the project progressed, Gilbane was "accused of turning power on and off" because Bayou Place tenants were experiencing sporadic power outages.  *Id.* at pg. 174:20-22.  On September 9, 2017, Houston First emailed Gilbane representatives and told Gilbane they had or would secure from Bayou Place, L.P. "[p]ermission to access their electrical room to dry and dehumidify."  **Ex. HH**, (Sept. 9, 2017 e-mail).  The email "reflects an attempt by Bayou Place to coordinate regarding at least in part work on the electrical equipment" and also "reflects that Bayou Place was not just independently seeking to do work without any involvement from DND/Gilbane[.]"  **Ex. GG**, 225:5-14.  "Houston First asked [Gilbane personnel] to coordinate with Bayou Place[.]"  *Id.* at 228:23-25.

On September 12, 2017, Bayou Place personnel escorted Gilbane's Program Manager Representative to the electrical room.  *Id.* at 226:1-4.  While there, Bayou Place personnel told Gilbane's Program Manager Representative that some of the electrical equipment was still energized.  *Id.* at 236:11-22.  The next day, Gilbane's Program Manager Representative e-mailed

12

multiple personnel of Gilbane and Houston First. **Ex. II,** (September 13, 2017 email). Gilbane's Program Manager Representative asked Houston First to request information about the electrical equipment and efforts to repair it. *Id.* Gilbane also sent Houston First a letter recommending Houston First ask Bayou Place whether a professional engineer and licensed electrical contractor had inspected the equipment. Gilbane also provided recommended repair steps. **Ex. JJ** (Sept. 13, 2017 Draft Letter). On Friday, September 15, 2017, counsel for Houston First forwarded Gilbane's letter to The Cordish Company and Bayou Place. **Ex. KK** (September 15, 2017 Letter). Meanwhile, Gilbane contractors constructed a wooden barricade around the door to the room housing the electrical equipment, and reported <u>internally</u> the room had been "<u>secured.</u>" **Ex. LL** (September 15, 2017 email). Gilbane's Safety Director on the project testified, however, that after the room was "barricaded," between 200 and 250 Gilbane workers on site were mustered and told the room had been "<u>isolated</u>," "using that language." **Ex. MM**, Virag Depo., pg. 260:2-4; 264:22-25; 265:1-17. Gilbane's Program Manager Representative then testified the term "isolation" is a term of art used by electricians, and can mean that the equipment described as "isolated"[19] could, but "not necessarily" mean it was de-energized (i.e., the equipment had been "isolated" from its power source). **Ex. GG,** pg. 239:3-8. He then conceded that "ambiguous language should not be used" by DND or Gilbane "with reference to whether or not electrical equipment is energized." *Id.* at 242:17-22.

On September 16, 2017, Plaintiffs, who had previously been working at the Bayou Place garage under Piper Development, were given access to the room housing the electrical equipment

---

19.  *See, e.g., Weakley v. Fischbach & Moore, Inc.*, 515 F.2d 1260, 1262 (5th Cir. 1975)(explaining an "isolator switch" is used to de-energize equipment so "there [i]s no current passing through" other equipment. "[E]ach switch opens the control circuit of its corresponding motor controller, depriving the motors of electrical power and interrupting the current flowing through the isolator switch." *Id.*). "Isolation means 'the absence of an electric path permitting the flow of DC current . . . between an input and an output of a circular stage, component, or circuit." *SynQor, Inc. v. Cisco Sys.*, 2014 U.S. Dist. LEXIS 94216, *8 (E.D. Tex. 2014).

to repair or replace it. **Ex. NN** (Arson Report). "A flash electrical explosion" occurred, inflicting burns on Plaintiffs. *Id.* In the aftermath, a witness provided a statement. Immediately after the incident, he heard someone on Plaintiffs' work crew— he "heard them say [']I thought it was isolated.[']" **Ex. OO** (Witness Statement). Gilbane's Safety Director testified the same 200-250 personnel he told the electrical equipment was "isolated" would be the same personnel who would have encountered "someone coming into the garage[.]" **Ex. MM,** pg. 263:2-21; 266:1-13.

Plaintiffs filed suit against all Defendants. The Tenth Amended Petition now alleges Cordish is liable for any actions taken by Bayou Place during the Harvey response efforts due to its alleged "control" over the actions of Bayou Place and Bayou Place personnel. **Ex. PP**.

## II.   STATE COURT ACTION

This case was initially filed in Harris County, Texas, Cause No.: 2017-72382, 129th Judicial District Court. Prior to removal, Plaintiff Valles styled Valles' operative Tenth Amended Petition *Norberto Valles v. Centerpoint Energy, Inc.*, *et al.*, Cause No.: 2017-72382. Plaintiff Undrea Bailey's operative pleading is the Fourth Amended Petition in Intervention. **Ex. QQ.**

## III.   PARTIES

### A.   Plaintiffs— Norberto Valles (Original Plaintiff); Undrea Bailey, Individually and as Next Friend of J.B.; Lillian Bailey (Intervenor Plaintiffs)

Norberto Valles was the original Plaintiff. Undrea Bailey, Individually and as Next Friend of J.B.; and Lillian Bailey intervened as Plaintiffs.

### B.   Defendants— "Cordish Defendants"

While legally-distinct entities, for ease of reference, Bayou Place Limited Partnership and The Cordish Company are referred to as the "Cordish Defendants." Cordish was joined as a party in the Tenth Amended Petition.

14

### C.    Defendant— Centerpoint Energy Houston, Electric

Centerpoint Energy Houston, Electric is a Defendant, and is referred to herein as "Centerpoint."  Additional Centerpoint entities are listed in the state court caption, but they have been dropped as parties.  **Ex. PP**.

### D.    Defendants— "Gilbane Defendants"

While legally-distinct entities, for ease of reference, Gilbane Reconstruction Services, LLC; Gilbane Development Company; Gilbane Building Company; and DND Construction Services, LLC are referred to herein as the "Gilbane Defendants."

### E.    Defendant— "Houston First"

Houston First Corporation is referred to herein as "Houston First."

### F.    Defendants— "Subcontractor Defendants"

Piper Development, LLC and Facility Solutions Group, Inc. are referred to herein as the "Subcontractor Defendants."

### G.    Defendants— "Defunct Parties"

Defendants Drake Electrical Services, LLC; Lightning Commercial LLC; and Draycatan Enterprises, Inc. are the "Defunct Parties."  Drake Electrical Services, LLC was non-suited from the lawsuit and is no longer a party. **Ex. RR**.  Defendant Draycatan Enterprises, Inc. forfeit its corporate charter due to non-compliance with the Texas Tax Code.  **Ex. SS**.  Defendant Lightning Commercial LLC forfeit its corporate charter due to non-compliance with the Texas Tax Code. **Ex. TT**.  Defendants Lightning Commercial LLC and Draycatan Enterprises, Inc. were also fraudulently joined as Defendants for the purposes of attempting to destroy federal jurisdiction— Plaintiff Undrea Bailey is listed as a Managing Member of Lightning Commercial LLC and was the organizer, director, and agent of Draycatan Enterprises, Inc. **Ex. UU; Ex. VV**.  While

15

Lightning Commercial LLC was joined by Norberto Valles, Plaintiff Undrea Bailey did not defend on behalf of Lightning Commercial LLC and allowed it to be defaulted, despite having been a party to the lawsuit at the time Plaintiff Valles sought the default. **Ex. WW**. Besides demonstrating fraudulent joinder, the default also precludes Lightning Commercial LLC from objecting (to the extent that right would exist) to removal. "The effect of the entry of default is that it cuts off the defendants' right to appear in the case[.]" *Twist & Shout Music v. Longneck Xpress, N.P.*, 441 F. Supp. 2d 782, 783 (E.D. Tex. 2006). Because Lightning Commercial LLC and Draycatan Enterprises, Inc. forfeit their corporate charters, they "shall be denied the right to sue or defend in a court of this state[.]" Tex. Tax Code 171.252.

## IV.    THE CLAIMS

### A.    Plaintiff Valles' Claims

Plaintiff Valles asserts that all Defendants named in his operative Tenth Amended Petition, including Centerpoint; the Subcontractor Defendants; the Cordish Defendants; Houston First; the Gilbane Defendants; and the Defunct Parties "were negligent, negligent per se, and grossly negligent." **Ex. PP**, ¶17. Valles alleges The Cordish Company "controlled" Bayou Place L.P., and that both Cordish Defendants "managed" Bayou Place. **Ex. PP**, ¶¶13, 15. Valles alleges Houston First is liable under the Texas Tort Claims Act as owner and/or possessor of the property at issue. **Ex. PP**, ¶16. Valles also seeks punitive damages, and demands a jury trial. **Ex. PP**, ¶¶19-20.

### B.    Bailey Plaintiffs' Claims

The Bailey Plaintiffs assert "Intervenors' damages were proximately caused by the negligence, carelessness, recklessness, and gross negligence of all Defendants named in the Fourth Amended Petition in Intervention, which includes Centerpoint; the Subcontractor Defendants;

16

Bayou Place L.P.; Houston First; the Gilbane Defendants; and a now-dismissed Defunct Party (Drake Electrical Services, LLC). **Ex. QQ,** ¶6.1. The Bailey Plaintiffs also assert claims for "loss of companionship, loss of society, loss of support, loss of friendship, loss of consortium, and all other remedies allowable under the law." **Ex. QQ,** ¶7.4. The Bailey Plaintiffs seek exemplary damages. **Ex. QQ,** ¶8.1.

## V.    JURISDICTION

### A.    Federal Question Jurisdiction Pursuant to the Government Contractor Defense— 28 U.S.C. § 1331 and 28 U.S.C. § 1442(a)(1)

#### 1.    The Supreme Court and the Fifth Circuit Have Directed Federal Jurisdiction to be Liberally Found Under 28 § U.S.C. 1442(a).

The Cordish Company invokes 28 § U.S.C. 1442(a)(1), which allows removal of state lawsuits against private entities, and "permits, in pertinent part, 'any person acting under [an officer] of the United States or of any agency thereof' to remove a state suit to federal court if any of the plaintiff's claims are 'for or *relating* to *any act* under color of such office.'" *Zeringue v. Crane Co.*, 846 F.3d 785, 789 (5th Cir. 2017)(citing 28 U.S.C. 1442(a))(emphasis supplied). "Section 1442 'is a pure jurisdictional statute' in which 'the raising of a federal question in the officer's removal petition . . . constitutes the federal law under which the action against the federal officer arises for [Article] III purposes.' It permits a federal *defense*, which is generally statutorily impotent to establish subject matter jurisdiction, to serve as the federal question that endues the court with jurisdiction." *Id.* "[T]he federal officer removal statute is liberally construed[.]" *Wilson v. CB&I Fed. Servs., LLC*, 2018 U.S. Dist. LEXIS 40053, at *6 (M.D. La. 2018). "[T]his right is not to be frustrated by a grudgingly narrow interpretation of the removal statute." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 398, 400 (5th Cir. 1998).

The burden to establish the propriety of removal under 28 U.S.C. § 1442 is low— to defeat jurisdiction under 28 U.S.C. § 1442, a plaintiff seeking remand must show the invocation of 28 U.S.C. § 1442 is "wholly insubstantial and frivolous." *Id.* at 789-90.  "That statute creates federal jurisdiction even over cases brought against private parties if they are sued for conduct they committed under the direction of federal authorities and for which they have a <u>colorable</u> defense under federal law." *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 375 (5th Cir. 2016)(emphasis supplied).  "As with a federal claim that creates federal question jurisdiction, a federal defense fulfilling this same function does not need to be 'clearly sustainable,' as § 1442 does not require a federal official, or a person acting under an official, to 'win his case before he can have it removed,' but rather the defense needs only to be 'colorable.' Although neither we nor the Supreme Court has defined 'colorable' in the context of § 1442, the Supreme Court has clarified that a non-colorable federal claim, for the purposes of federal question jurisdiction, is a claim that is 'immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Zeringue,* 846 F.3d at 789-90.  Therefore, so long as the removing defendant removes based on 28 U.S.C. § 1442, federal jurisdiction should be found if the removal petition provides minimal support that the assertion of the defense is "not without foundation and made in good faith." *Id.* at n.13.

Congress deemed it important "to ensure a federal forum in any case" where a person acting under color of federal direction is sued.  *Winters*, 149 F.3d at 400 (5th Cir. 1998).  "If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection, if their protection must be left to the action of the State court, the operations of the

18

general government may at any time be arrested at the will of one of its members." *Id.* at 397.  As a result, unique provisions favoring removal and federal jurisdiction were enacted by Congress. "With regard to 28 U.S.C. § 1442 . . . '[a]lthough the principle of limited federal court jurisdiction ordinarily compels us to resolve any doubts about removal in favor of remand . . . courts have not applied that tiebreaker when it comes to the federal officer removal statute in light of its broad reach.'" *Zeringue*, 846 F.3d at 789 (quoting *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 462 (5th Cir. 2016)).  Moreover, the "right of removal is 'absolute for conduct performed under color of federal office.'" *Winters*, 149 F.3d at 397.  Therefore, consent from Co-Defendants is not required.   "Removal under §  1442(a),  unlike removal under §  1441,  does  not  require the consent of co-defendants." *Humphries v. Elliott Co.*, 760 F.3d 414, 417 (5th Cir. 2014). Finally, removal under 28 U.S.C. § 1442 is one of the rare circumstances in which an order of remand is immediately appealable on an interlocutory basis.  "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise." 28 § U.S.C. 1447(d).

2.    Elements of Government Contractor Removal

To establish the right to removal under 28 U.S.C § 1442 in the context of actions taken after  the  Stafford  Act  is  invoked  to  respond  to  an  exigent  event  or  natural  disaster, "[d]erivative immunity under the *Boyle* framework [the test for Section 1442 defenses fashioned by  the  Supreme  Court]  could  apply  in  the  Stafford  Act  context  where:  (1)  the  agency,  in  its discretion,  approved  reasonably  precise  specifications  regarding  the  management  of  a  recovery site;  (2)  the  agency  supervised  and  controlled  an  entity  charged  with  implementing  those specifications; and (3) the entity warned the agency about any dangers known to it but not to the

agency." *McCue v. City of N.Y. (In re World Trade Ctr. Disaster Site, Litig.)*, 521 F.3d 169, 197 (2d Cir. 2008). *See also*, *Katrina Canal Breaches Litig. Steering Comm. v. Wash. Grp. Int'l, Inc.*, 620 F.3d 455, 460 (5th Cir. 2010)(providing similar formulation under traditional *Boyle* test). *See also*, *Zeringue*, 846 F.3d at 789 (providing slightly different articulation, and stating "[w]e have interpreted this part of the statute to require a defendant to show (1) that it is a person within the meaning of the statute, (2) that it has 'a colorable federal defense,' (3) that it 'acted pursuant to a federal officer's directions,' and (4) 'that a causal nexus exists between [its] actions under color of federal office and the plaintiff's claims.'").

To establish the first prong, "'[d]irect oversight of the specific acts that give rise to a plaintiff's complaint is not required' and instead it 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior[.]'". *Wilson v. CB&I Fed. Servs., LLC*, 2018 U.S. Dist. LEXIS 40053, at *7-8 (M.D. La. 2018)(quoting *Zeringue*, 846 F.3d at 792). 28 U.S.C. § 1442, "[s]tripped to its essentials, is fundamentally a claim that 'the Government made me do it.'" *In re Katrina*, 620 F.3d at 465.

Courts have accepted the *McCue* analysis as applicable in the wake of a natural, rather than man-made disaster, and have actually broadened its reach. Discussing *McCue*, the Court in *Deepwater Horizon* pointed out that "the [*McCue*] court explained that the purpose of the Stafford Act implicated a unique federal interest—coordinating federal disaster assistance and streamlining the management of largescale disaster recovery projects—which would be directly affected if a private or local government entity did not follow federal directives for fear of state liability. The court concluded derivative immunity was available to the defendants, *including* entities contracted by the city, and not the federal government." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex.*, No. 2179, 2011 U.S. Dist. LEXIS 113424, at *24 (E.D. La. 2011). when there

20

is a federal regulatory framework that addresses the circumstances presented by the disaster, the framework must be considered in connection with the immunity analysis.  *Id.*  "The basic framework for the response management structure is a system (e.g., a unified command system) that brings together the functions of the Federal Government, the state government, and the responsible party to achieve an effective and efficient response . . . This unique federal interest would be directly affected if private parties . . . refused to follow a federal directive for fear of liability.  Therefore, private entities can derive immunity from the government under [a federal statute regulating the entity's conduct] irrespective of contractual privity."  *Id.* at 24.  The Fifth Circuit affirmed, and dismissed on the merits because the federal regulatory framework governed over local law.  "Analysis of federal law thus inevitably precedes the Parishes' simplistic *lex loci delicti* theory.  Federal law covers the disaster[.]"  *In re Deepwater Horizon*, 745 F.3d 157, 165 (5th Cir. 2014).

With respect to the second prong, "[c]onformity may be shown by evidence that 'the government supervised and controlled the implementation of the government approved reasonably precise specifications."  *Sewell,* 2016 U.S. Dist. LEXIS 176298, at *69 (citing *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001)).  "'[A]n unwanted condition' does not negate a showing of a contractor's conformity[.]'"  *Id.*at *69 (quoting *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 703 (5th Cir. 1993)).   *Id.*

To establish the third prong, the removing party only needs to demonstrate actual or constructive knowledge of the relevant danger on the part of the government agent from whom the removing party receives directions.  "If the government "knew of the risks associated," or if the dangers at issue are "obvious risks inherent to the [work]" or are risks that the government would have known about because the government encountered them in previous similar projects such

21

that "[e]xperience was on [the government's] side" the final prong of the government contractor defense is satisfied.  *Id.* at *72.

> a.  *FEMA Provided Reasonably Precise Specifications Regarding the Management of the Bayou Place Garages*

Here, FEMA provided reasonably precise specifications regarding the management and execution of the remediation efforts.  FEMA unquestionably had the power to do so.  President Trump vested FEMA with authority "to allocate from funds available . . . as [FEMA] find[s] necessary for Federal disaster assistance and administrative expenses."  **Ex. E**.  "Direct Federal assistance [was] authorized."  **Ex. E**.  FEMA was empowered to provide "Hazard Mitigation throughout the State, and any other forms of assistance under the Stafford Act that [FEMA] deem[s] appropriate[.]"  **Ex. E**.  This type of comprehensive federal involvement is exactly what is contemplated when a State requests the President issue a Disaster Declaration pursuant to the federal Stafford Act.  "The Stafford Act is triggered when the Governor of the affected state asks the President to declare that a 'major disaster exists' and the President so declares . . . [a]ll requests for a declaration by the President that a major disaster exists shall be made by the Governor of the affected State."  *Maleche v. Solis*, 692 F. Supp. 2d 679, 683 (S.D. Tex. 2010) (quoting 42 U.S.C. § 5122(2); 42 U.S.C. § 5170).  As a result, when the Governor of Texas issued a Disaster Proclamation, he was asking for the type of federal involvement the government contractor defense contemplates.

FEMA worked in coordination with DOE, which dispatched DOE operatives to FEMA.  **Ex. H**.  With almost 300,000 customers without power, DOE advised that "[r]estoration in severely damaged or flooded areas will be delayed[.]"  **Ex. K**, pg. 4.  In response, and in furtherance of the federal government's coordination and oversight, the Governor of Texas issued "[a] proclamation that suspends all laws allowing public utilities to enter and use private property as necessary for

the limited purpose of connecting power lines and reconstructing the electric utility grid[.]" **Ex. L**, pg. 1.  He directed all "State and local political subdivisions and special districts to temporarily provide full and complete access to . . . utility and other public easements and state-owned or controlled land for these same purposes[.]"  *Id.*, pg. 2.  He did so pursuant to his power to "commandeer or use any private property" in an emergency, under a statute that specifically contemplates coordination with the federal government engaged in response efforts pursuant to the federal Stafford Act.  Tex. Gov. Code 418.016(g)(1); 418.017.

With respect to the actual work, as part of FEMA's efforts, FEMA distributed funds to Texas, which then acted as FEMA's agent to allocate funds to local governments.  **Ex. DD**, pg. 20.  A portion of those funds was specifically designated for repairs to the "Wortham Theater and Garages" as a "Priority Repair/Construction Project[.]" **Ex. DD,** pgs. 22-23.  Funds were provided to Houston for debris removal, including "silt remediation" and "debris remediation."  **Ex. DD**, pg. 20.  Gilbane was generally complying with FEMA requirements (**Ex. GG**, Walsh Depo., pg. 217:13-21) and Gilbane's work involved removing silt and debris from the Bayou Place garages. **Ex. GG**, pg. 77:23-25; 78:1-11.  FEMA funds were also provided in the immediate aftermath of Harvey "to protect public health and safety and City facilities[.]"  **Ex. DD**, pg. 21.  In direct contemplation and in furtherance of such efforts, the Texas Governor suspended electrical regulations, instructed private entities to provide access so that electrical equipment could be repaired, and "local political subdivisions and special districts" were "directed to temporarily provide full and complete access[.]"  **Ex. L**.  The same state statutory framework that contemplates federal involvement through the Stafford Act expressly empowers the Governor of Texas to "control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area."  Tex. Gov. Code § 418.018.  So, when the federal government

23

notified the Governor of Texas that electrical repairs were being delayed, he responded by invoking emergency statutes that contemplate working with federal oversight under the Stafford Act, and issued Proclamations intended to further the express purposes of FEMA funding.

FEMA officials were on the ground working directly with local authorities. Ex. **XX**. Members of Congress, FEMA, and County officials discussed relief efforts. **Ex. YY**. To ensure FEMA funds could be applied to the Bayou Place garage remediation efforts, the Gilbane Defendants complied with FEMA's requirements. **Ex. GG**, Walsh Depo., pg. 217:13-21. Those requirements, as stated by the City of Houston, are "[s]trict and detailed rules for administering th[e] assistance [and] must be followed to the letter to avoid possible future deobligation – or 'claw-back' – of the funds from the City. FEMA tracks each type of damage into categories of work that range from emergency to 'put back' activities to reconstruction.'" **Ex. DD**, pg. 20. Moreover, FEMA inspected the work at the Bayou Place garages to ensure compliance. **Ex. GG**, pg. 218:2-16. After the Governor of Texas ordered political subdivisions and special districts to provide complete access for electrical repairs for the same purposes that FEMA funding was disbursed, Houston First and Gilbane sought to coordinate with Bayou Place and Cordish to conduct electrical repairs. **Ex. GG**, 225:5-14; 228:23-25 (testimony that they sought to coordinate); **Ex. HH** (email discussing electrical repairs). Gilbane drafted proposed repair steps, and asked whether a licensed electrician and engineer had inspected the equipment. **Ex. JJ**. Houston First then forwarded the Gilbane letter to The Cordish Company and Bayou Place. **Ex. KK**. When Plaintiffs were dispatched to conduct the repairs, they held themselves out as qualified, because they had already been working at the site under Piper Development. **Ex. NN**.

There is no question that the federal government, specifically through FEMA, provided both overarching direction in the response to Hurricane Harvey, as well as reasonably precise specifications for the actual work.

>   b.   *Cordish and Bayou Place Were Supervised and Controlled by an Agent of FEMA Charged With Implementing Federal Specifications*

As stated above, direct supervision or control directly from the federal agency is unnecessary to establish a government contractor defense. *Wilson*, 2018 U.S. Dist. LEXIS 40053, at *7-8 (quoting *Zeringue*, 846 F.3d at 792). Moreover, direct contractual privity between the party asserting the defense and the federal agency is not required. *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex.*, 2011 U.S. Dist. LEXIS 113424, at *24 (adopting analysis of *McCue*, 521 F.3d at 197). Instead, the focus is on whether Bayou Place L.P. and The Cordish Company were complying with directives intended to further the interests of the federal government. *Id*.

Plaintiff alleges all of Bayou Place L.P.'s conduct and employees are effectively controlled by The Cordish Company. **Ex. PP**. The Lease between Bayou Place and the City of Houston contemplates the City's tenant will always be an affiliate of The Cordish Company. **Ex. Z**, pg. 000145. The Lease also contemplates that Bayou Place L.P. may be required to conduct certain repairs in the event a casualty event damages improvements, but not the entire garage, but in contrast, requires the City of Houston to repair the garage if the entire garage is damaged. **Ex. Z**, pgs. 000083, sec. 10.1; 000086, sec. 10.2. Houston First was supposed to direct third-parties not in contract with Gilbane to cooperate with Gilbane. **Ex. EE**, at sec. 7.13. Gilbane was supposed to coordinate among Houston First, Gilbane, and Bayou Place/Cordish. **Ex. EE**, at sec. 3.2. That is exactly what happened, and it was done in furtherance of FEMA's goals. Gilbane, which was generally complying with FEMA requirements on the project, asked Houston First to help

coordinate with Bayou Place L.P. and The Cordish Company, and was primarily concerned with ensuring that qualified personnel would inspect and repair the damaged electrical equipment. **Ex. II**. Houston First then forwarded Gilbane's message to Bayou Place L.P. and The Cordish Company. **Ex. KK**. Bayou Place L.P., as an affiliate of The Cordish Company, owed certain repair obligations to the City of Houston pursuant to the Lease, and The Cordish Company received notices pursuant to the Lease. Houston First, in order to further the remediation efforts for which FEMA provided "strict and detailed rules" that Gilbane was generally complying with, and to further the life and safety concerns FEMA funding sought to address (and in fact, FEMA funding had been allocated specifically for the Bayou Place garages), could assert not only contractual rights on behalf of the City of Houston under the Lease, but also the mandatory directive of the Texas Governor to "local political subdivisions and special districts" "to temporarily provide full and complete access" for electrical repairs. **Ex. L**. As stated before, the Texas Governor exercised his authority to issue such a directive under a statute that provides for cooperation with federal agencies pursuant to the Stafford Act, and his authority was issued for the same purposes that FEMA had articulated should be a priority.

> c.    *FEMA and its Agents Had Both Constructive and Actual Knowledge of the Danger Presented*

The federal government and FEMA specifically, had constructive and actual knowledge of the danger presented. So did Gilbane and Houston First, who were acting under color of authority that (1) emanated from the President of the United States pursuant to the Stafford Act; (2) was exercised by FEMA and other federal agencies to coordinate, direct, and fund State and local efforts; (3) reached the local level by virtue of State and local government directives to carry out the purposes intended by the federal government, which (4) ultimately resulted in oversight and

direction of Gilbane and Houston First intended to comply with federal directives, and achieve federal objectives.

The federal government was (and is) well aware of the hazards presented by flooded electrical equipment, and specifically plans and warns about it in the aftermath of a hurricane. **Ex. ZZ** (OSHA Fact Sheet).[20]  DOE, which was providing information to and coordinating with FEMA and Texas state and local authorities (**Ex. H; Ex. K**, pg. 4), was aware that inundated equipment presented a hazard and included information in its bulletins to that effect. *See, e.g.,* **Ex. N**, pg. 2. DOE advised FEMA, and Texas state and local authorities, that downtown Houston was flooded, and Centerpoint customers were impacted. **Ex. K**, pg. 4.  Bayou Place L.P., an affiliate of The Cordish Company, and under control of The Cordish Company as Plaintiff Valles alleges, escorted Gilbane personnel to the electrical equipment, and told them it was energized. **Ex. GG**, pg. 226:1-22.  Gilbane's Program Manager then notified Houston First. **Ex. II**.  Moreover, as Gilbane's Safety Director testified, it is common knowledge that working on flooded electrical equipment presents a danger of electrocution. **Ex. MM**. pg. 48:1-4 (Q: "Why is it important to turn off energized systems before work is done on them?" A: "Because you will get electrocuted.").

Nothing more is required.  "If the government "knew of the risks associated," or if the dangers at issue are "obvious risks inherent to the [work]" or are risks that the government would have known about because the government encountered them in previous similar projects such that "[e]xperience was on [the government's] side" the final prong of the government contractor defense is satisfied. *Sewell,* 2016 U.S. Dist. LEXIS 176298, at at *72.

       *d.*      *Stafford Act Defense*

---

[20]    https://www.osha.gov/OshDoc/data_Hurricane_Facts/floodcleanup.pdf

Occasionally, courts require articulation of the specific body of law giving rise to a government contractor defense under 28 U.S.C. § 1442. Bayou Place L.P. and The Cordish Company (and by necessary extension under the same analysis, Houston First and the Gilbane Defendants) were acting pursuant to federal directions issued under color of federal authority which came to life after the Governor of Texas requested federal aid, and the President of the United States issued a Disaster Declaration pursuant to the Stafford Act. FEMA is entitled to immunity under the Stafford Act. *St Tammany Par. v. FEMA*, 556 F.3d 307, 318 (5th Cir. 2009). As a corollary, derivative immunity flows to private entities acting pursuant to FEMA's directives under the Stafford Act, either through direct application of Stafford Act immunity, or through the application of federal common law to achieve the same result. *McCue*, 521 F.3d at 194, 198.

**B.      Federal Question Jurisdiction Pursuant to 28 U.S.C. 1442(a)(2)**

28 U.S.C. 1442(a)(2) provides that a civil action may be removed if it involves "[a] property holder whose title is derived from [a federal] officer, where such action or prosecution affects the validity of any law of the United States."

Bayou Place L.P. leases the premises from the City of Houston. **Ex. Z**. The Lease is a ground lease, however, which creates a fee simple determinable interest, meaning Bayou Place L.P. has an actual ownership interest, and not a mere leasehold. *See, e.g., Farina v. Calvary Hill Cemetery*, 566 S.W.2d 650 (Tex. Ct. App.—[Texarkana] 1978)(discussing legal effect of fee simple determinable interests). The Lease provides the City of Houston retains ownership of "[t]he Land and all Existing Improvements," however, "[d]uring the term of this Agreement, all [Bayou Place LP] Improvements shall remain the property of [Bayou Place L.P.] [but] upon termination of this Agreement . . . all Permanent Improvements shall belong to the City[.]" **Ex. Z**, sec. 5.8, pg. 000037-000038. Texas law recognizes leases are critical in defining whether improvements

28

to land are intended to become part of the real property in the lessee-lessor context. *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 838 (Tex. App.—Austin 2004). And, a permanent improvement to reality is "a permanent part of the realty to which it is affixed." *Logan v. Mullis*, 686 S.W.2d 605, 607 (Tex. 1985).

As stated in section VI.A, *supra*, Houston received funds from FEMA, and was acting under color of a federal officer when it received and distributed FEMA funding. Bayou Place L.P.'s interest in the right of exclusive control, consistent with the legal rights that typically attach to a fee simple interest in realty, was also infringed by the Governor of Texas. He issued a Proclamation to give effect to the same priorities announced by the President of the United States and FEMA, in which he ordered local political subdivisions to provide "full and complete access" and private entities to provide access for power restoration. **Ex. L**. That Proclamation was issued pursuant to a statutory framework that expects coordination with federal agencies operating under the Stafford Act, and authorizes the governor to "commandeer or use any private property[.]" Tex. Gov. Code § 418.016(g); 418.017(c). When the Governor of Texas exercised core emergency powers that vest in the sovereign to narrow the extent of Bayou Place L.P.'s defeasible fee interest, the extent to which Bayou Place L.P.'s title did not give way to governmental exigencies necessarily derived from the Texas Governor, the personification of State sovereignty, while acting as a federal officer. Therefore, Bayou Place L.P.'s title, during the time period in which the Governor of Texas and the City of Houston were acting under color of federal authority (and when Plaintiffs were injured), was derived from what remained after a State actor serving as a federal officer "commandeered" private property to the extent deemed necessary.

Moreover, FEMA funds were used to repair and remediate fixtures in the Bayou Place garages, and under the Lease, "Improvements shall remain the property of [Bayou Place L.P. until]

termination of this [Lease]." **Ex. Z**, sec. 5.8, pg. 000037-000038. Improvements are considered realty, (*See Logan*, *supra*) and purchases of realty with federal funds renders 28 U.S.C. § 1442(a)(2) applicable. *See, e.g., Town of Davis v. W. Va. Power & Transmission Co.*, 647 F. Supp. 2d 622, 624, 627 (N.D.W. Va. 2007)(stating, [t]he notice of removal states that CVI purchased the land in question with federal grant money disbursed to it by the National Oceanic and Atmospheric Administration ('NOAA'), an agency of the United States Department of Commerce . . . the motion to remand must be denied."). The realty itself need not be sold by the federal government to the removing party. *Id.* at n.1 (describing removing party as private entity that purchased land from State entity and private entity with federal funds). "Though employed in various ways, title is generally used to describe either the *manner* in which a right to real property is acquired, or the right itself." *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC*, 809 F. Supp. 2d 524, 535 (E.D. La. 2011)(emphasis supplied).

This action affects the validity of several United States laws. If the Cordish Defendants were found liable notwithstanding the applicability of the government contractor defense, it would be a finding that federal immunity of private entities derived from the federal Stafford Act is superseded by Texas common law. The Cordish Defendants will also move to join, or designate the Army Corps of Engineers as a responsible third party in this lawsuit. If the Army Corps of Engineers is allocated fault, it would affect the applicability of sovereign immunity provisions of the Stafford Act and the Flood Control Act that inure to the U.S. Army Corps of Engineers, because it would create a precedent under which a court has found they do not apply. "The Corps conducts its emergency response and recovery activities under two basic authorities: The Stafford Disaster and Emergency Assistance Act (Stafford Act); and [the] Flood Control [Act]." **Ex. G**, pg. 18. The Army Corps of Engineers also interprets the Federal Tort Claims Act and the federal Flood Control

30

Immunity Statute as <u>completely</u> insulating the Army Corps of Engineers from any liability arising as a result of intentional releases of floodwaters from the Addicks and Barker Dams that cause damage or injury downstream.  **Ex. AAA** (Army Corps Legal Memorandum "Addicks and Barker Reservoirs Legal Takings Analysis").  "In the event that upstream flooding required the Corps to increase releases greater than 2,000 CFS, even though economic damage would result, there appears to be no liability to the United States under existing case law."  **Ex. AAA**, pg. 6.  Thus, were fault attributed to the Army Corps of Engineers, it would undermine their asserted legal position in future cases, and affect the validity of their statutory defenses under the Federal Tort Claims Act and Flood Control Immunity Statute.

Finally, were this lawsuit successful, it would implicate the validity of Stafford Act provisions enabling federal coordination efforts in the aftermath of a federal disaster, as well as the validity of Presidential Declarations issued to the same end—private entities would be reluctant to comply, for fear of liability.  "If a federal agency orders a private [person or entity] or City agency to implement decisions made by the federal agency, in its discretion, <u>we think that 'the interests of the United States will be directly affected' if the [private person or entity] or City agency does not follow those orders for fear of liability</u>."  *McCue*, 521 F.3d 169, 197. "Displacement [of state law] will occur [if] a 'significant conflict' exists between an identified 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation."  *Deepwater Horizon,* 2011 U.S. Dist. LEXIS 113424, at *23-24 (quoting *Boyle v. United States*, 487 U.S. 500 (1988)).

### C.    Federal Question Jurisdiction Pursuant to the Supreme Court *Grable* Doctrine—28 U.S.C. § 1331

Plaintiffs' claims arise under federal law.  They implicate multiple federal statutes which alter the standard of care and impact causation analyses, and multiple federal statutes and doctrines

which give rise to derivative immunity.  The federal government has a substantial interest in the issues raised.  Federal question jurisdiction exists under the *Grable* doctrine.

1.    The Grable Doctrine Allows Removal for Cases Involving Embedded Federal Issues.

Federal courts have long recognized that federal question jurisdiction may not be avoided simply by leaving out explicit references to federal statutes.  As previously articulated by the Supreme Court, claims purportedly brought under state law that are "federal in nature . . . [can] ha[ve] a sufficient federal character to support removal . . . [a] Court . . . [may] agree that [a litigant] had attempted to avoid removal jurisdiction by artfully casting their essentially federal law claims as state law claims [and] [w]e will not question here that factual finding."  *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 397, n.2 (1981).

In *Grable v. Darue Eng'g &Mfg.*, 545 U.S. 308 (2005), the Supreme Court gave this "longstanding" principal more structure, stating "this Court ha[s] recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues.  *Id.* at 312.  "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law[.]"  *Id.*  So, under *Grable*, even concurrent jurisdiction claims invoke "federal-question jurisdiction [if they] really and substantially involve a dispute or controversy respecting the validity, construction, or effect of federal law."  *Id.* at 313.  There is not a "single, precise, all-embracing test for federal issues embedded in state law claims . . . [i]nstead, the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Id.* at 314.

32

If a party must apply federal law and apply a standard "within the meaning of the federal statute [so it] is thus an essential element of the [party's] claim, and the meaning of the federal statute is actually in dispute" then the "case warrants federal jurisdiction" because it necessarily raises a disputed federal issue that is substantial to the case. *Id.* at 315. If the circumstances indicate that exercising federal jurisdiction will not have a significant effect on the balance of cases litigated in federal and state court, removal is appropriate under *Grable*. *Id.* Those circumstances exist where the purportedly state law claim raises federal issues that parties will usually not have occasion to litigate in state court. *Id.* "[When] the rare state [court] action [arises] that involves contested issues of federal law" in a matter typically litigated in federal court, "there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of the state-law . . . claim." *Id.* at 319-320.

Reinforcing *Grable*, the Supreme Court later held that "Section 1331, our decisions indicate, is not swept away so easily . . . when federal law creates a private right of action and furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction[.]" *Mims v. Arrow Fin. Serv's, LLC*, 565 U.S. 368, 378-79 (2012). Echoing its admonition not to "shirk from federal jurisdiction," the Supreme Court held there should be no presumption applied against federal jurisdiction in that scenario, because "divestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. §1331." *Id.* at 379. That is particularly the case where "[t]he federal interest in regulating [the area] . . . is evident from the regulatory role Congress assigned to [the federal government] . . . [because] Congress' design would be less well served if [parties] had to rely on the laws or rules of a court of a State [or] the accident of diversity jurisdiction[.]" *Id.* at 383. As the Fifth Circuit

recognized recently, where the interpretation or application of federal law will have "broader ramifications for the legal system" than simply resolving the claims immediately at issue, federal jurisdiction should be exercised. *Xitronix Corp. v. KLA-Tencor Corp.*, 2019 U.S. App. LEXIS 4672, at \*24 (5th Cir. 2019).

While federal courts speak in terms of "substantial" federal issues that go to required elements of proof and are usually litigated in federal court, at base, federal courts should exercise federal question jurisdiction if it is clear that the claims fundamentally implicate federal law, even when a party does its best to avoid "magic words" that explicitly invoke a federal statute. Even today, the Fifth Circuit will finding "passing reference to federal claims" to at least support federal jurisdiction, even if the party "did not formally raise any federal claims[.]" *Adams v. Bank of Am.*, 475 F. App'x 526, 526 n.1 (5th Cir. 2012)(not overturning federal question basis for removal, while also finding diversity jurisdiction). These bedrock principles apply here, and harmonize "with the command that the federal courts have a virtually unflagging obligation to exercise the jurisdiction given them." *Sierra Club, Inc. v. Sandy Creek Energy Assocs.*, 627 F.3d 134, 144 (5th Cir. 2010).

        2.      <u>Plaintiffs' Claims Implicate Federal Laws and Trigger the *Grable* Doctrine.</u>

Plaintiffs' claims unavoidably give rise to federal question jurisdiction. Federal law alters the applicable standards of care, and causation elements of their claims. The Federal government has a "unique" interest in responding to a national disaster, because it implicates core functions delegated to the Federal government by the United States Constitution. This lawsuit implicates a body of Federal law that is comprehensively regulated, and also gives rise to a substantial interest in the outcome, because it may have ramifications for the manner in which federal agencies responding to a disaster carry out their duties.

        *a.*   *Retaining Jurisdiction Preserves the Intended Balance of Federal and State Judicial Responsibilities.*

34

Under *Grable*, while not a dispositive factor, federal courts should consider whether Congress has indicated the issues raised should be litigated in federal court, and whether the issues raised are primarily litigated in federal court. *Grable*, 545 U.S. at 318-19. Plaintiffs, no doubt, will argue this is a routine negligence case, typically litigated in state court. Not so.

Lawsuits seeking relief for conduct undertaken in the course of federal disaster relief efforts triggered by the Stafford Act and carried out by FEMA require a federal forum. *See, e.g., Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Agency*, 708 F.3d 893, 897 (7th Cir. 2013). The appropriate federal *venue* is a latent issue which depends on the type of claim and relief sought, but it is clear that claims arising from conduct undertaken during federal disaster relief efforts under the Stafford Act belong in federal court. *Id.*

Under *Grable*, comprehensive federal legislation in the area of concern indicates that federal court is the intended forum. As stated recently by the Fifth Circuit in upholding *Grable* doctrine jurisdiction:

> [H]ere, one of the primary subjects of dispute between the parties is whether the federal laws in question may properly be interpreted to [alter the standard of care.] . . . Relatedly, the scope and limitations of a complex federal regulatory framework are at stake in this case, and disposition of the question whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other.

> *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 725 (5th Cir. 2017).

Here, the Cordish Defendants assert that the Presidential Declaration of Disaster, which triggered the Stafford Act, gives rise to immunity under the Stafford Act. The Stafford Act is intended to provide framework for a "comprehensive federal response." *McCue*, 521 F.3d at 194. There is a "unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects, as evidenced by the Stafford Act." *Id.* at

197.   Moreover, mandatory governmental orders issued during a disaster alter the appropriate standard of care in a plaintiff's affirmative claims, and also impact causation requirements in a plaintiff's affirmative claims.  *See, e.g., Taira Lynn Marine Ltd. No. 5, LLC v. Jays Seafood, Inc.*, 444 F.3d 371, 381 (5th Cir. 2006)(granting partial summary judgment because mandatory evacuation order altered standard of care, and rendered proximate cause attenuated).  Finally, because this lawsuit will implicate whether federal agencies may be assigned fault, this lawsuit triggers the Federal Tort Claims Act, Flood Control Act, and Flood Control Immunity Statute discussed *supra*.

All of these issues are almost exclusively, and are clearly intended to be litigated in federal court.  Retaining jurisdiction will not upset the traditional balance of labor between State and Federal courts.

> b.   *Resolving a Federal Issue is Necessary to Resolution of Plaintiffs' Claims.*

The same issue presented in *Tenn. Gas* that gave rise to *Grable* doctrine jurisdiction exists here.  As explained by *Tenn. Gas*, resolving federal issues is necessary to resolve Plaintiffs' claims. "[H]ere, one of the primary subjects of dispute between the parties is whether the federal laws in question may properly be interpreted to [alter the standard of care.]  . . . Relatedly, the scope and limitations of a complex federal regulatory framework are at stake in this case, and disposition of the question whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other.  *Tenn. Gas*, 850 F.3d at 725.  The invocation of federal emergency powers and laws, and issuance of government emergency directives, alters the standard of care and causation analysis.  *Taira Lynn*, 444 F.3d at 381.  The extent to which a federal agency may be assigned fault in this case depends on the application of federal statutes which waive federal liability under certain circumstances.  The

36

application of the government contractor defense requires the application of Stafford Act provisions and federal common law.

While Plaintiffs assert claims couched in state-law negligence theories, the federal issues which will govern the application of the elements of Plaintiffs' causes of action (as well as defenses) give rise to jurisdiction. "[W]e conclude that the [Plaintiff's] negligence and nuisance claims necessarily raise federal issues sufficient to justify federal jurisdiction[.]" *Tenn. Gas*, 850 F.3d at 725-26.

### c.  The Federal Issue is Disputed.

All of the issues addressed above are disputed. Plaintiffs assert the normal standard of care applied in non-emergency settings applies. The Cordish Defendants disagree, and assert (1) federal actions taken pursuant to federal laws altered the standard of care and will impact causation analyses; and (2) they are entitled to a federal government contractor defense and derivative immunity pursuant to the Stafford Act. Plaintiffs disagree. Plaintiffs also do not believe a federal agency is necessary or proper party, and do not seek to attribute fault to any federal agency. The Cordish Defendants disagree, and assert the Army Corps of Engineers (at a minimum) is a responsible third party.

### d.  The Federal Issue is Substantial.

The federal issues at play are substantial. The Stafford Act is intended to provide framework for a "comprehensive federal response." *McCue*, 521 F.3d at 194. There is a "unique federal interest in coordinating federal disaster assistance and streamlining the management of large-scale disaster recovery projects, as evidenced by the Stafford Act." *Id.* at 197. The federal government also has a substantial interest in the reaction of States, local governments, and citizens to its coordination and response efforts in the wake of a disaster. If a federal agency orders a

private [person or entity] or City agency to implement decisions made by the federal agency, in its discretion, we think that 'the interests of the United States will be directly affected' if the [private person or entity] or City agency does not follow those orders for fear of liability." *Id.*

As reflected by the unique procedural rules applied to government contractor removal, the federal government has a strong interest in adjudicating the applicability of plausible government contractor immunity defenses in federal court. "[The Supreme Court] described derivative immunity in terms of preemption: "Displacement [of state law] will occur [if] a 'significant conflict' exists between an identified 'federal policy or interest and the [operation] of state law,' or the application of state law would 'frustrate specific objectives' of federal legislation." *Deepwater Horizon*, 2011 U.S. Dist. LEXIS 113424, at *15. (Quoting *Boyle v. United States*, 487 U.S. 500 (1988)). "If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection, if their protection must be left to the action of the State court, the operations of the general government may at any time be arrested at the will of one of its members." *Winters*, 149 F.3d at 397. Congress sought to avoid that result.

Where, and under what circumstances a federal agency may be attributed fault for actions taken while responding to a natural disaster is a matter of interest to the federal government, because it impacts Congressional appropriations. **Ex. CC**. Avoiding the creation of precedent for future cases is of substantial interest federal agencies. **Ex. AAA**. Under *Grable*, the vesting of federal jurisdiction for claims under the Stafford Act and Federal Tort Claims Act, as well as the fact that the federal response regulatory framework is comprehensive, is an expression by Congress that these issues are of substantial importance.

Jurisdiction pursuant to the *Grable* doctrine exists.  This Court should hear this case under *Grable*.

## VI.    TIMELINENESS

The Cordish Company was provided notice of the operative Petition April 11, 2019.  **Ex. PP**. The Cordish Company has not yet been formally served, so the deadline to remove has not yet been triggered.  In any event, even if measured from April 11, 2019, this removal is filed within thirty days and is timely.

## VII.    CONSENT TO REMOVAL

Consent to removal is not required under 28 § U.S.C. 1442.  "Removal under § 1442(a), unlike removal under § 1441, does not require the consent of co-defendants."  *Humphries v. Elliott Co.*, 760 F.3d 414, 417 (5th Cir. 2014).  To the extent consent may be required for removal under the *Grable* doctrine, Cordish will timely supplement or amend this removal petition within thirty days of The Cordish Company's May 9, 2019 Notice of Acceptance of Service and Notice of Appearance filed in state court.  *Avila v. JPMorgan Chase Bank, Nat'l Ass'n*, 2015 U.S. Dist. LEXIS 142695, at *7 (N.D. Tex. 2015).

## VIII.    ATTACHMENTS

Pursuant to 28 U.S.C. § 1446, Local Rule 3, and Local Rule 81, the following Exhibits are attached hereto and incorporated herein by reference for all purposes.

**Exhibit A:**    NOAA Report

**Exhibit B:**    Initial Texas Proclamation of Disaster

**Exhibit C:**    Report Reflecting Mayoral Declaration of Disaster

**Exhibit D:**    Harris County Declaration of Disaster

**Exhibit E:**    Federal Declaration of Disaster

2742205v.1

**Exhibit F**:    National Weather Service Alert

**Exhibit G**:    Transcript of Congressional Homeland Security Hearing

**Exhibit H**:    DOE Report

**Exhibit I**:    List of DOE Event Summaries

**Exhibit J**:    Congressional Report on Electrical Grid After Harvey

**Exhibit K**:    DOE Event Summary #6

**Exhibit L**:    State Proclamation Suspending Laws to Allow Electrical Repairs

**Exhibit M**:    DOE Event Summary #8

**Exhibit N**:    DOE Event Summary #9

**Exhibit O**:    Army Corps of Engineers Alert on Release of Floodwaters

**Exhibit P**:    Levee Breach Alert

**Exhibit Q**:    Army Corps of Engineers Alert on Unexpected Increased Releases

**Exhibit R**:    Houston Downtown District Information

**Exhibit S**:    Bayou Place Information

**Exhibit T**:    Houston Downtown District Parking Map

**Exhibit U**:    Houston First Corporation Map

**Exhibit V**:    Houston First Corporation Information

**Exhibit W**:    City of Houston Financial Report

**Exhibit X**:    City RFP

**Exhibit Y**:    Houston First Corporation Presentation

**Exhibit Z**:    Houston-Bayou Place L.P. Lease

**Exhibit AA**:    Army Corps of Engineers Inundation Map

**Exhibit BB**:    Report on Theater District Underground Parking Garages

**Exhibit CC**:    Federal Appropriations Records

**Exhibit DD**:    Houston Report on Harvey Relief Efforts and Federal Funding

2742205v.1

**Exhibit EE**:   Houston-Gilbane Contract

**Exhibit FF**:   Gilbane-DND Contract

**Exhibit GG**:   Transcript of Walsh Deposition

**Exhibit HH**:   September 9, 2017 Email

**Exhibit II**:   September 13, 2017 Email

**Exhibit JJ**:   Second September 13, 2017 Email

**Exhibit KK**:   September 15, 2017 Letter

**Exhibit LL**:   September 15, 2017 Email

**Exhibit MM**:   Transcript of Virag Deposition

**Exhibit NN**:   Arson Investigation Records

**Exhibit OO**:   Witness Statement

**Exhibit PP**:   Valles Tenth Amended Petition

**Exhibit QQ**:   Bailey Fourth Amended Petition in Intervention

**Exhibit RR**:   Amended Notice of Non-Suit

**Exhibit SS**:   Texas Tax Forfeiture- Draycatan

**Exhibit TT**:   Texas Tax Forfeiture- Lightning Commercial

**Exhibit UU**:   Lightning Commercial Corporate Documents

**Exhibit VV**:   Draycatan Corporate Documents

**Exhibit WW**: Lightning Commercial Default

**Exhibit XX**:   Harris County Record Reflecting FEMA Coordination

**Exhibit YY**:   Harris County Record Reflecting FEMA and Congressional Involvement

**Exhibit ZZ**:   OSHA Fact Sheet

**Exhibit AAA**: Army Corps of Engineers "Addicks and Barker Reservoirs Legal Takings Analysis" Legal Opinion

**Exhibit BBB**: Index of All Matters Being Filed

41

**Exhibit CCC**: List of All Counsel of Record, Including Addresses, Telephone Numbers, and Parties Represented

**Exhibit DDD**: Copy of State Court Notice of Removal

**Exhibit EEE**: Copy of Required State Court File Materials

## IX.    CONCLUSION

Cordish has established its right to remove this lawsuit to federal court under three alternative bases. Cordish therefore requests this Court issue an order confirming its jurisdiction. Cordish requests this, and all other relief just and appropriate under the circumstances.

Respectfully submitted on May 9, 2019.

**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**

*/s/ Michael Beckelman*
_____

**MICHAEL BECKELMAN**
State Bar No. 24042401
Michael.Beckelman@wilsonelser.com
**B. GEORGE WALKER**
State Bar No. 24094144
George.Walker@wilsonelser.com
909 Fannin Street, Suite 3300
Houston, Texas 77010
(713) 353-2000  Telephone
(713) 785-7780  Facsimile

**COUNSEL FOR DEFENDANTS THE CORDISH COMPANY and BAYOU PLACE L.P.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record on this the 9th day of May, 2019, through the Court's automatic distribution system, in conformity with the Federal Rules of Civil Procedure, and through e-mail service.

/s/ *Michael Beckelman*

Michael Beckelman

43